An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of A p p e l l a t e   P r o c e d u r e .

NO. COA13-921

NORTH CAROLINA COURT OF APPEALS

Filed:  7 October 2014

JUSTIN MORGAN HALL,
    Plaintiff

        v.                              Catawba County
                                        No. 11 CVD 2481
STACY MARIE HALL,
    Defendant.

_____

JUSTIN MORGAN HALL,
    Plaintiff,

        v.

STACY MARIE HALL,                       Catawba County
    Defendant,                          No. 11 CVD 2482

    And

BRIAN COFFEY,
    Defendant.


    Appeal by defendant from order entered 21 December 2012 by

Judge Robert A. Mullinax, Jr. in Catawba County District Court.

Heard in the Court of Appeals 20 February 2014.


    *Wesley E. Starnes for plaintiff-appellee.*

    *Crowe & Davis, P.A., by H. Kent Crowe, for defendant-*

*appellant.*

DAVIS, Judge.

Stacy Marie Hall ("Defendant") appeals from the trial court's 21 December 2012 order granting Justin Morgan Hall ("Plaintiff") primary physical and legal custody of her minor children "Luke" and "Nathan."[1]  On appeal, she argues that the trial court erred by (1) failing to apply the appropriate legal standard in determining that Defendant had acted in a manner inconsistent with her constitutionally-protected status as a parent of Luke; and (2) making inadequate findings of fact to support its conclusion that awarding primary custody to Plaintiff was in the children's best interests.  After careful review, we vacate the trial court's order and remand for further proceedings.

## Factual Background

Plaintiff and Defendant were married in January of 2007 and separated in June of 2011.  During their marriage, the parties had one child together, Nathan, who was born in 2007.  Defendant also has a child from a previous relationship with Brian Coffey ("Mr. Coffey"), Luke, born in 2005.

---

[1]  Pseudonyms are used throughout the opinion to protect the privacy of the minor children.

Following their separation, Plaintiff filed a complaint in Catawba County District Court on 12 August 2011 seeking primary custody of Nathan, child support, equitable distribution, and attorneys' fees. Plaintiff also sought emergency custody of Nathan, alleging that (1) Defendant had moved to Ohio to live with her boyfriend, leaving both minor children in Plaintiff's care; (2) Defendant had then threatened to take the children to Ohio; and (3) Plaintiff was concerned that Defendant would flee to Ohio with the children in an attempt to elude the jurisdiction of North Carolina's courts. The trial court granted temporary emergency custody of Nathan to Plaintiff.

Also on 12 August 2011, Plaintiff filed a separate complaint against Defendant and Mr. Coffey seeking emergency custody, temporary and permanent custody, and child support for Luke. Plaintiff was granted temporary emergency custody of Luke. On 18 August 2011, Mr. Coffey filed an answer denying Plaintiff's allegations that Mr. Coffey had not made significant efforts to contact or establish a relationship with Luke and requesting that the trial court award custody "to the person or persons legally entitled and whom the court concludes will act in the best interest of [Luke]."

On 14 October 2011, the trial court entered a temporary custody order regarding Luke which continued primary physical

custody with Plaintiff and established a visitation schedule for Defendant and Mr. Coffey. In that order, the trial court concluded that Defendant and Mr. Coffey had "acted inconsistently with their constitutionally protected status and thereby waived their status as the biological parents of the minor child, [Luke]." On 17 October 2011, the trial court entered a temporary custody order continuing primary physical custody of Nathan with Plaintiff and establishing a visitation schedule for Defendant.

On 3 January 2012, Defendant filed answers and counterclaims seeking custody of Luke and Nathan. On 17 July 2012, Defendant filed motions (1) alleging that Plaintiff had violated the trial court's temporary custody orders by taking the minor children out of state to Myrtle Beach, South Carolina and by consuming alcohol in the children's presence; and (2) requesting that the trial court hold him in contempt.

The parties' respective claims for child custody and support and Defendant's motion for contempt came on for hearing on 18 September 2012. On 21 December 2012, the trial court entered an order (1) concluding that Defendant and Mr. Coffey had "acted in a manner inconsistent with their constitutionally protected status as parents of the minor children"; (2) granting primary physical and legal custody of Luke and Nathan to

Plaintiff; (3) establishing a summer and holiday visitation schedule for Defendant with both children; (4) establishing a visitation schedule for Mr. Coffey with Luke; and (5) holding Plaintiff in contempt for violating the temporary custody orders and ordering him to pay $250.00. Defendant gave timely notice of appeal to this Court.

## Analysis

Initially, we note that Defendant failed to serve Mr. Coffey with copies of her brief and the record on appeal until well after the time requirements set forth in the Appellate Rules of Procedure. Plaintiff contends that these violations require dismissal of her appeal as to Luke, Mr. Coffey's biological son.

It is well established that a violation of the jurisdictional rules governing the taking of an appeal requires this Court to dismiss the appeal. *See Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 197, 657 S.E.2d 361, 365 (2008) ("A jurisdictional default . . . precludes the appellate court from acting in any manner other than to dismiss the appeal."). However, the violations in the present case were nonjurisdictional and, consequently, do not mandate our dismissal of this appeal.

Here, Defendant served Mr. Coffey with her notice of appeal

in accordance with Rule 3 of the North Carolina Rules of Appellate Procedure, thereby apprising him of the appeal, affording him the opportunity to participate, *and* conferring jurisdiction upon this Court. *See Bailey v. State*, 353 N.C. 142, 156, 540 S.E.2d 313, 322 (2000) ("In order to confer jurisdiction on the state's appellate courts, appellants of lower court orders must comply with the requirements of Rule 3 of the North Carolina Rules of Appellate Procedure."). Defendant's subsequent failure to timely serve Mr. Coffey with the record on appeal and her brief — although a violation of the Appellate Rules — does not compel us to dismiss the appeal. *See Henlajon, Inc. v. Branch Highways, Inc.*, 149 N.C. App. 329, 333, 560 S.E.2d 598, 602 (2002) (explaining that rule governing timing of service of documents on other parties is not jurisdictional and "does not automatically mandate dismissal").

Because we conclude that Defendant's violation has not frustrated the adversarial process and does not impede our review of this appeal, we proceed to address the merits of the case. *See Dogwood*, 362 N.C. at 200, 657 S.E.2d at 366-67 (stating that appellate court may consider "whether and to what extent the noncompliance [with the Appellate Rules] impairs the court's task of review and whether and to what extent review on the merits would frustrate the adversarial process" when

determining if there was a substantial failure or gross violation of the appellate rules).

## I. Defendant's Constitutionally-Protected Status as Parent

A legal parent enjoys a "constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child." *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997). As such, in a custody dispute between a legal parent and a non-parent, the best interests standard applies only if the trial court first finds by clear and convincing evidence that the legal parent's conduct has been inconsistent with his or her constitutionally-protected status. *Best v. Gallup*, 215 N.C. App. 483, 490, 715 S.E.2d 597, 601 (2011), *appeal dismissed and disc. review denied*, ___ N.C. ___, 724 S.E.2d 505 (2012). Defendant contends that in the present case, it is not clear whether the trial court applied the appropriate "clear and convincing evidence" standard when it concluded that Defendant had acted inconsistently with her constitutionally-protected status as a parent when determining custody of Luke. We agree.

In *Bennett v. Hawkes*, 170 N.C. App. 426, 613 S.E.2d 40 (2005), the trial court awarded primary physical custody of the child to her paternal grandparents. In its order, the trial court concluded as a matter of law that the child's mother and

father "have acted inconsistently with their constitutionally protected status as parents" and that "[t]he best interest of the minor child will be served by residing primarily with the [paternal grandparents]." *Id.* at 427-28, 613 S.E.2d at 41. On appeal, this Court held that remand was required because it was unclear which standard the trial court had applied when considering whether the appellant-mother had acted inconsistently with her parental status. *Id.* at 429, 613 S.E.2d at 42. We explained that the trial court's failure to articulate the standard it applied was "critical" because "while the general standard of proof in child custody cases is by a preponderance of the evidence, . . . where the natural parent's constitutionally protected status is at issue, the standard of proof is clear and convincing evidence." *Id.*

As in *Bennett*, we cannot determine in the present case which standard the trial court employed when considering Defendant's constitutionally-protected status as Luke's parent. Neither the permanent custody order entered on 21 December 2012 nor the temporary order entered on 14 October 2011 articulated the standard of proof the trial court used when concluding that Defendant had acted inconsistently with her constitutionally-protected status as Luke's parent. As such, on remand, the trial court is directed to utilize the "clear and convincing

evidence" standard in evaluating whether Defendant has acted inconsistently with her constitutionally-protected status as a parent.

## II. Sufficiency of the Findings of Fact

Defendant also argues on appeal that the trial court's findings of fact are insufficient to support its ultimate conclusion that awarding primary physical and legal custody of both Luke and Nathan to Plaintiff was in the children's best interests. It is well established that when entering a custody order, the trial court must make sufficient findings of fact to support its conclusions of law. *Peters v. Pennington*, 210 N.C. App. 1, 13, 707 S.E.2d 724, 733 (2011); *see* N.C. Gen. Stat. § 50-13.2(a) (2013) ("An order for custody must include findings of fact which support the determination of what is in the best interest of the child."). "The determination of what will best promote the interest and welfare of the child, that is, what is in the best interest of the child, is a conclusion of law, and this conclusion must be supported by findings of fact as to the characteristics of the parties competing for custody." *Hunt v. Hunt*, 112 N.C. App. 722, 728, 436 S.E.2d 856, 860 (1993) (internal citation and quotation marks omitted). This Court reviews whether the trial court's findings adequately support its ultimate conclusions *de novo* on appeal. *Carpenter v.*

*Carpenter*, ___ N.C. App. ___, ___, 737 S.E.2d 783, 785 (2013).

Here, the custody order gave primary physical and legal custody of both children to Plaintiff. Consequently, in order to support this custody arrangement for Nathan, the court was required to make findings demonstrating that the award of primary custody to Plaintiff was in Nathan's best interests. *See Everette v. Collins*, 176 N.C. App. 168, 173, 625 S.E.2d 796, 799 (2006) ("In a custody dispute between two natural parents 'the best interest of the child' test must be applied.").

However, because Plaintiff is not Luke's biological father, in order to support its decision to grant Plaintiff primary custody of Luke, the trial court was required to make adequate findings supporting a determination both that (1) Defendant had acted in a manner inconsistent with her constitutionally-protected status as Luke's biological parent; and (2) placing primary custody of Luke with Plaintiff was in Luke's best interests. *See Davis v. Swan*, 206 N.C. App. 521, 525, 697 S.E.2d 473, 476-77 (2010) ("[T]he best interests of the child standard applies in a custody dispute between a legal parent and a non-parent when clear and convincing evidence demonstrates that the legal parent's conduct has been inconsistent with his or her constitutionally protected status."), *disc. review denied*, ___ N.C. ___, 706 S.E.2d 239 (2011).

Findings adequate to support the legal conclusion that awarding custody to a particular party will be in the best interests of the child should address the characteristics of the competing parties and "may concern physical, mental, or financial fitness or any other factors brought out by the evidence and relevant to the issue of the welfare of the child." *Hall v. Hall*, 188 N.C. App. 527, 532, 655 S.E.2d 901, 905 (2008) (citation and quotation marks omitted). These findings must be more than conclusory statements or recitations of the evidence; instead, they must resolve the issues in dispute and bear upon the parties' respective fitness to care for the child. *Carpenter*, ___ N.C. App. at ___, 737 S.E.2d at 787.

> A custody order is fatally defective where it fails to make detailed findings of fact from which an appellate court can determine that the order is in the best interest of the child, and custody orders are routinely vacated where the "findings of fact" consist of mere conclusory statements that the party being awarded custody is a fit and proper person to have custody and that it will be in the best interest of the child to award custody to that person. A custody order will also be vacated where the findings of fact are too meager to support the award.

*Id.* (citation and brackets omitted).

Here, in concluding that Plaintiff should be awarded primary physical and legal custody of Luke and Nathan, the trial court made the following pertinent findings of fact:

1. The minor child, [Luke], . . . is the biological child of Stacy Hall and Brian Coffey.

2. The minor child [Luke] is in the 2nd grade at Jenkins Elementary School.

3. During the 2011-2012 academic school year, [Luke's] teacher was Ms. Perez in the first grade.

4. Mr. Hall picked [Luke] up from Jenkins and dropped him off [at] Jenkins; he was a "room parent" whereby he volunteered at the school, assigning various other parents to volunteer in the classroom. He attended field trips, parent-teacher association events and meetings, provided snacks and materials for the class.

5. According to Ms. Perez' testimony, Mr. Hall performed his duties as "room parent" exceptionally and was the single most-involved parent in the first grade class for 2011-2012 at Jenkins Elementary School.

6. The minor child, [Luke], presented with no consistent behavioral problems, although he did disrupt class some in the beginning of the year. He did so by exhibiting behavior such as bringing a bug into the classroom via his pants' pocket, talking in line, and playing and talking during carpet time. As evidenced by his mid-year behavior chart, his behavior improved considerably as the year progressed. Ms. Perez has never met Brian Coffey; she has met Ms. Stacy Hall once, in the cafeteria, when she came to have lunch with [Luke]. Ms. Perez conducted either three (3) or four (4) parent-teacher conferences with Mr. Hall, two of which Ms. Perez initiated and two of which, Mr. Hall initiated. In the 2011-2012 academic year, the minor child [Luke] was tardy on an unexcused basis 25 times, an amount which is

unacceptable and excessive.

7. [Luke's] current teacher is a Ms. Mary Rose Grimes who teaches the second grade at Jenkins Elementary School, and has for approximately the last 12 years. According to [Luke's] progress report, he has had an excellent start to the second grade. Mr. Hall has again, agreed to be [Luke's] "room parent," again volunteering and agreeing to assist with events such as the Walk-a-Thon. Ms. Grimes has met both Mr. Coffey and Ms. Hall at the "sneak preview" which took place the day before school started. Ms. Grimes also received an electronic mail communication from Mr. Coffey, asking how the minor child [Luke] was doing. Jenkins Elementary School is a school of distinction. The minor child [Luke] is an active participant in the mileage club which meets on Fridays and encourages the children to get out and exercise. In the year 2012, he has logged 42.2 miles.

8. The minor child, [Nathan], . . . is a product of the marriage between Mr. and Ms. Hall. The minor child is enrolled in Kindergarten at Jenkins, and his teacher is Ms. Karen Taylor. She has assisted the minor child, [Nathan], in learning his numbers and letters, and learning to write his name. Mr. Justin Hall volunteers approximately one (1) time per week in the minor child's classroom. Ms. Taylor met Ms. Hall at a "sneak preview" event similar to the one conducted by Ms. Grimes; she has received an e-mail request from Ms. Hall to receive e-mail updates on [Nathan's] progress. She has received several e-mails from Ms. Hall referencing the minor child, [Nathan]. [Nathan] has had his frog moved one time for talking on the carpet.

. . . .

10. . . . . Justin Hall is employed at ICM Distribution. In 2011, he made $59,000. His earnings are 100% commission based. His work requires extensive travel, Monday through Thursday, to places such as Greensboro, Winston-Salem, Boone, Fayetteville; Knoxville, Tennessee; and Blacksburg, Virginia area. His travel requires that he spend 10-11 nights per year away from home. He makes bi-annual trips in January and June to the Outer Banks. He is off Friday, Saturday, and Sunday.

. . . .

12. Mr. Hall has donated school supplies to both of his minor children's classes. He is the head coach of [Luke's] basketball team at the Hickory Rec Department, a 5 and 6-year old league. Games were in November and December 2011 on Tuesdays and Thursdays every week for six (6) weeks. He had no assistance, and 6-8 people were on the team known as the Hickory Tigers. The minor child [Luke] is in Pack 1 of the Tiger Scouts which meets at Corinth Reformed Church. There are 6-7 Scouts in his troop which meets once per week on Mondays at 6:30 p.m. The meetings began six (6) weeks after school started in the 2012 academic school year. [Luke] has only missed 2-3 Tiger Scout meetings. Mr. Hall is the Associate Den Leader, David Ohler is the Den Leader. The minor child [Luke] played machine-pitched baseball from April through the end of May 2012 at the St. Stephens Optimist Club. Mr. Hall was the volunteer Assistant Manager. Mr. Coffey came to half the games. Mr. Hall purchased uniforms and equipment and was present for all practices and games.

. . . .

14. Mr. Hall attends LakeView Baptist Church and with the help of his mother, sees to it

that [Luke] attends Sunday School, church, and is involved in the Youth Choir. Both [Nathan] and [Luke] participated in the 2011 children's Christmas play, with [Nathan] playing the role of a shepherd.

15. The minor child, [Nathan], plays soccer for the BlackHawks; Mr. Hall is an assistant coach. Games were held in January and February 2012. The minor children typically spend every other Saturday night with Mr. Hall's parents and a weekend night once per month with a member of Ms. Hall's family.

16. Ms. Hall has exercised considerable, additional visitation time than that contemplated by the Temporary Order of Custody entered in August 2011. Those visits have included two (2) consecutive overnights.

17. Ms. Hall has provided Mr. Hall with zero dollars and zero cents for the support and maintenance of the minor children since the entry of the Temporary Order of Child Custody, although she has purchased [a] substantial amount of clothing including shorts and shoes; food and snacks for the minor children. On June 29, Ms. Hall took the minor children to Ocean Isle Beach, North Carolina for a 2-night vacation. Mr. Hall did not go, and had no objection to Ms. Hall's request. Simultaneously, the Hall family was vacationing in Horry County, South Carolina. Ms. Hall took the children from Ocean Isle Beach, North Carolina, to Myrtle Beach, South Carolina. The minor children stayed at the beach with the Halls; 3-4 days after the beginning of the Hall family vacation, Ms. Stephanie Adams, a former girlfriend of Mr. Hall, arrived. They dated for approximately 5½ months. She has three (3) children, ages 7, 3, and 10½ months. The children have three (3) separate fathers, one of whom is deceased.

Ms. Adams stayed overnight for two (2) nights at the Hall family 4-bedroom vacation rental home.

18. Mr. Hall explains the minor child [Luke's] excessive tardies as a result of his disturbing tendency to oversleep. His former bedtime was between midnight and 2:30 a.m. His testimony is that he has alleviated the problem by going to bed around 11:00 p.m. His efforts as a father to the minor child [Nathan] and as a father figure to the minor child [Luke] are admirable, although his failure to have the minor child [Luke] at school on time has denied the minor child access to the Pledge of Allegiance, reading time, and most importantly to the lesson that no one likes to be kept waiting. Mr. Hall has taken the minor children camping at the Bear Den near Asheville, North Carolina and in Jefferson, in the extreme northwest corner of North Carolina. He has facilitated friendships between [Nathan] and a boy named James and between [Luke] and boys named Cole and Kelly.

19. December 12-17, 2011, Ms. Hall stayed with Mr. Hall to facilitate additional time to spend with her minor children. On December 15, Ms. Hall allowed the minor children to miss school to visit with her. She has participated in watching ballgames and taking the minor children to and from school when she is in Catawba County, North Carolina. She uses her uncle Ronnie's residence as well as Mr. Hall's residence as well as motels to facilitate her visits.

20. On approximately three (3) occasions, the Halls had difficulty with the minor child [Luke's] conclusion of visits with his mother.

21. Mr. Hall socializes with male and female

patrons at a karaoke/sports bar known as Crawdaddy's. His favorite karaoke song is "Rebel Yell," by Billy Idol. He has a friend named "Rainbow" whom he met at Crawdaddy's. In late January, he engaged in a sexual relationship with a Ms. Laurel Hendrix in his home while the minor children were at their paternal grandparents' residence.

22. In September 2011, the minor children visited Horry County, South Carolina. Ms. Hall was contacted, and provided no resistance. The trips to South Carolina, although a minimal violation of the Order, are, in fact, violations of the Order; the violations are willful and Ms. Hall's either implicit or explicit consent to the violations is not a lawful excuse.

23. The minor children attended summer camp and Bible school at LakeView Baptist Church, and are "lively young men," according to Ms. Walker, their Sunday School teacher. Mr. Hall served as a Sunday School teacher and volunteered at the children's church once every two (2) to three (3) weeks. Ms. Stacy Hall stayed with Mr. Justin Hall September 13- September 17, 2012, again to facilitate time with the minor children.

24. Ms. Donna Hall, the minor child [Nathan's] paternal grandmother, is employed at Hickory High School as a registered nurse and as a health science teacher. She picks up both boys after school at approximately 3:10 p.m. some two (2) to three (3) times per week. She keeps the boys some two (2) to three (3) times per week until Mr. Hall returns from work. She lives with her husband in a 3-bedroom home. She took the kids to Broadway at the Beach located in Myrtle Beach, South Carolina. Her husband is a program manager for a phone company, and he works out of the home. Both Ms.

Donna Hall and her husband assist Mr. Justin Hall with expenses required to maintain the minor children. Ms. Donna Hall attended [Luke's] first grade spring program, "Pizza/Bingo Fundraiser" at Jenkins Elementary School. She makes Sunday lunch for the boys after church and attends the boys' various athletic events. She and the minor children's maternal grandmother, Anita McKinney, have an excellent working relationship which consists of weekly contact and acknowledge that the boys love them both. Involvement of both grandmothers is necessitated, as it is in many circumstances, specifically when a mother moves to Ohio to live with her boyfriend.

25. Mr. Justin Hall and Ms. Stephanie Adams consumed wine at the beach while the minor children were in their physical possession, again a direct violation of the Temporary Order of Child Custody; no lawful excuse was provided and the violation was willful.

. . . .

28. Ms. Stacy Hall is 27 years old, and resides in Pickering, Ohio, some 18 miles from Columbus. She moved to Ohio in July 2011 initially residing in New Albany, Ohio; in September 2011 she moved to Pickerington. From August 2011 until December 2011 she was a staffing member for a home health care service. From January through June 2012 she worked at Buckeye Home Care from 9:00 a.m. until 4:00 p.m. She made $15.00 per hour and was a patient services director. She worked for Mr. Earl Bruce, who is best-known as the head football coach at Ohio State University. He had the unenviable task of replacing legendary Coach Woody Hayes, which he did successfully, winning four (4) Big Ten championships in a 7-year period. Coach Bruce, unfortunately down-sized his company, resulting in Ms. Hall's current

unemployment.

29. She receives unemployment checks in the amount of $178.00 per week. She paints apartment walls and puts up curtains for a customer, and makes approximately $300 per month. She is on track to graduate from Limestone College with a liberal arts degree via an online program in the Spring of 2013. She receives FAFSA (Federal Student Aid) to help with tuition costs. Prior to attending Limestone College, she attended Catawba Valley Community College in an attempt to become a Certified Nurse's Assistant (CNA). The Court has received no information as to bad faith or underemployment on her part and declines to impute any income to Ms. Hall.

30. Ms. Hall is involved in a romantic relationship with Mr. Justin Coolbaugh with whom she moved to Ohio in June 2011. He is the planning leader at Ensource, a natural gas company; he has no children. They share a 4-bedroom 2½ bathroom home that he owns, and which is located some six (6) hours and forty five minutes from Catawba County, North Carolina. The residence is valued at approximately $235,000.00. Initially, Ms. Hall moved into a townhome in New Albany to which she still has access. Mr. Coolbaugh and Ms. Hall are engaged to be married and have set a date of April 6, 2013.

31. She has dutifully and faithfully exercised her every-other Saturday visitation as contemplated by the Temporary Child Custody Order. She either stays at Mr. Hall's home, a hotel, or Uncle Ronnie's. She filled out information to enroll the minor children at Jenkins Elementary School for the 2012-2013 academic school year. She has made efforts to be involved in the minor children's academic and extra-curricular activities, which efforts are made much more difficult by her decision to follow Mr.

Coolbaugh to central Ohio, some 6 hours and 45 minutes away from the only home that the boys have ever known.

32. She took the minor children to Tweetsie and hiking. She has heard the minor children use profanity. In September 2011 Mr. Coolbaugh and Mr. Hall exchanged pleasantries in the presence of the minor child. In March 2012, Mr. Hall and Mr. Coolbaugh again exchanged pleasantries at [Nathan's] soccer trophy presentation. Ms. Hall provided birthday gifts and packages for [Nathan] at a party at Glenn Hilton Park, and took [Luke] fishing and had a cookout at Uncle Ronnie's for his birthday. She made birthday bags for [Nathan's] class that consisted of candies and dollar coins purchased at Party City.

33. The minor children would attend Colgate Elementary School which is located 1.2 miles from her current residence in central Ohio. She lives in a neighborhood with two (2) playgrounds and lots of kids. She is friends with people who have children. The Court has received no evidence of any other family members of [Nathan] or [Luke] residing in central Ohio; neither child has ever been to central Ohio. While in Ohio, Ms. Hall volunteered at the Nationwide Children's Hospital, Neo-Natal unit. Her current residence is located on Button Hush Lane. She proposes Ms. Missy Lee as alternative child caregiver should she (Ms. Hall) have to work or study. She became engaged to Mr. Coolbaugh on June 10, 2012. No one from Ms. Hall's family has visited her residence since moving to Ohio.

34. Ms. Hall has spent in excess of $10,000 in travel expenses and assisting Mr. Hall in providing for the necessities for the minor children since the entry of the Temporary Order. Ms. Hall's father lives in Bristol,

Tennessee. Ms. Hall's father has not been to her residence in Ohio.

35. Both Halls have cursed in front of the minor children. Their curse words have included ["s—t"] and ["f— you."]

36. On November 2, 2012, Ms. Hall opted out of a possible visitation with the minor children to eat dinner with cousin; John, at the establishment Mr. Hall made famous, also known as Crawdaddy's. Mr. Danny Hendrix, previously mentioned, paternal grandfather of the minor child, works some 50 hours a week. His work commitments as a truck driver make it difficult for him to have consistent visitation time with the minor children.

. . . .

38. Justin Morgan Hall is a fit and proper person to exercise care, custody and control of the minor children, [Luke and Nathan], with the Defendant, Stacy Hall, and the Defendant, Brian Coffey, fit and proper people to exercise visitation as set forth more fully herein.

These findings primarily consist of a mere recitation of facts in evidence and fail to (1) actually resolve the parties' disputes as to their respective fitness to exercise care, custody, and control of Nathan and Luke; and (2) sufficiently explain why awarding primary custody to Plaintiff is in the minor children's best interests. *See In re H.J.A.*, ___ N.C. App. ___, ___, 735 S.E.2d 359, 363 (2012) ("The trial court must . . . find the ultimate facts essential to support the

conclusions of law. Evidentiary facts are those subsidiary facts required to prove the ultimate facts. Ultimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts." (citations and quotation marks omitted)); *Carpenter*, ___ N.C. App. at ___, 737 S.E.2d at 790 (remanding for additional findings where trial court's order failed to "explain *why* awarding primary custody of [the minor child] to defendant is in [the minor child's] best interest").

Here, the primary issues raised by the parties revolved around (1) Plaintiff's various violations of the temporary custody orders; (2) Plaintiff's fondness for socializing on the weekends and frequenting a drinking establishment/karaoke bar called Crawdaddy's; (3) Plaintiff's failure to ensure Luke's arrival at school on time; (4) Defendant's decision in June of 2011 to leave the children in Plaintiff's care and move to Ohio to be with her now-fiancé Justin Coolbaugh; and (5) Defendant's desire for the minor children to live primarily with her in Ohio. While the trial court entered findings on these issues, it did not actually resolve the parties' disputes by making ultimate factual findings specifically indicating how these matters related to or impacted the children's welfare. *See Dixon v. Dixon*, 67 N.C. App. 73, 78, 312 S.E.2d 669, 672 (1984) ("[T]he findings in a custody order bearing on the party's

fitness to have care, custody, and control of the child and the findings as to the best interests of the child must resolve all questions raised by the evidence pertaining thereto.").

In *Carpenter*, our Court reviewed a custody order which — like the order from which Defendant currently appeals — contained findings that merely recited the evidence presented and "fail[ed] to resolve the primary issues raised by the evidence which bear directly upon the child's welfare." *Carpenter*, ___ N.C. App. at ___, 737 S.E.2d at 787. In that case, the disputed issues concerning the child's welfare were the "defendant's allegations of excessive alcohol consumption by [the] plaintiff, conflicts in the parties' parenting styles, and [the child's] resulting anxiety." *Id.* at ___, 737 S.E.2d at 787. While the trial court made some findings addressing the disputed issues, these findings failed to explain the impact these matters had on the minor child's welfare. *See id.* at ___, 737 S.E.2d at 789 ("The order addresses other disputed issues . . . without relating the findings to [the child's] needs or best interest. It is difficult to discern the meaning of some of the findings, or at least how the findings relate to the child's welfare."). Consequently, we remanded the matter to the trial court so that it could make additional findings of fact resolving the disputed issues and explaining why the custody

arrangement was in the best interests of the child. *Id.* at ___, 737 S.E.2d at 790.

We believe that the same course of action is appropriate here. In this case, the trial court's findings acknowledged the above-referenced issues by making findings of fact addressing Plaintiff's violation of the temporary custody orders, his frequenting of Crawdaddy's, and his failure to get Luke to school on time. The trial court also made findings addressing the difficulty and added expense Defendant has faced in exercising her visitation because of the distance between Ohio and Catawba County, the increased involvement of the parties' mothers in caring for the children due to Plaintiff's move to Ohio, and the school the children would attend if they were to reside in Ohio with Plaintiff. Absent from the trial court's findings, however, is any explanation of how these issues affect the welfare and best interests of Luke and Nathan.

In addition, for reasons more fully explained above, the trial court's findings and conclusions regarding Defendant's constitutionally-protected status as Luke's biological parent are insufficient as they do not adequately facilitate effective appellate review. As such, we conclude that remanding this action is appropriate so that the trial court can enter appropriate findings of fact resolving these issues and

explaining why the custody arrangement it ultimately orders is in the children's best interests.

Plaintiff contends that the trial court's findings of fact were sufficient to support the award of primary custody of the children to him, particularly in light of the fact that the parties stipulated to the trial court's ability to take judicial notice of the temporary custody orders that were entered in October of 2011 and incorporate those findings and conclusions into the permanent custody order "as if more fully stated forth herein." *See Davis v. McMillian*, 152 N.C. App. 53, 57-58, 567 S.E.2d 159, 161-62 (2002) (explaining that trial court may take judicial notice of findings from prior custody order regarding child); *Raynor v. Odom*, 124 N.C. App. 724, 728, 478 S.E.2d 655, 657 (1996) ("No decisions in North Carolina specifically indicate that it is improper for a trial court to use orders from temporary hearings . . . in the same case to support permanent custody orders. This Court has found that it is not improper for a trial court to take judicial notice of earlier proceedings in the same cause.").

Taking judicial notice of the temporary custody orders does not, however, cure the deficiencies noted above in the trial court's 21 December 2012 order. This is so because the additional findings contained in the earlier orders do not

resolve the above-referenced issues or address the 13-month period between the hearing on temporary custody and the hearing on permanent custody.

Because there is sufficient evidence in the record upon which appropriate findings of fact to support a custody determination may be made, the trial court need not hold a new trial or take additional evidence on remand. Rather, based on the evidence presented at trial, the trial court must make additional findings (1) resolving the parties' disputes regarding the children's welfare; and (2) explaining why its ultimate custody determination is in Luke's and Nathan's best interests. *See Carpenter*, ___ N.C. App. at ___, n. 4, 737 S.E.2d at 790, n. 4 (concluding that new trial was unnecessary where record contained sufficient evidence to make findings supporting custody determination and trial court "simply failed to make those findings").

### Conclusion

For the reasons stated above, we vacate the trial court's custody order and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.

Judges CALABRIA AND STROUD concur.

Report per Rule 30(e).